Let me just tell the lawyers that Justice Harris is also assigned to this case, and he will be listening to the argument that is being taped, but he will not be participating. Would the lawyers who are going to argue each tell us their name and spell their last name, please? Good afternoon, my name is Lauria Guvernia, spelled I-E-R-E-M-I-A, on behalf of Chicago Behavioral Hospital. Good morning, my name is Stephanie Rubin. I will be speaking on behalf of Lee Ritter, a special administrator of the estate of James Ritter, deceased. Okay, thank you. You each have 20 minutes. You do not need to use your full 20 minutes. Ms. Iremia, would you like to reserve any of your time for rebuttal? Yes, I reserve five minutes. You certainly may, and you may start whenever you are ready. Thank you. Good afternoon, Your Honors. Again, my name is Laura Iremia, and I represent the defendant appellant, Chicago Behavioral Hospital. The unrebutted evidence demonstrates that the trial court erroneously concluded that the hospital did not meet its burden in establishing privilege over two documents protected from discovery by the Medical Studies Act, as well as a third document protected under the insurer-insured privilege. And am I just to be clear, the third document you're not at all arguing under the Medical Studies Act, only under the insurer-insured. That is correct, Your Honor. Because the trial court's ruling was against the manifest rate of the evidence, this Court should reverse the trial court's orders overruling the hospital's assertions of privilege, and vacate the order holding the hospital in contempt and assessing a monetary penalty, given that the hospital is acting in good faith and testing the correctness of the trial court's ruling. The first two documents, the Sentinel Event Report and the Investigation Summary, fall squarely within the protections of the Medical Studies Act. Followed, for my own edification, I want to make sure, the Sentinel Event Report was authored by Ms. Barker, is that right? Is it Barker Baker? I forget. Barker? Barker, Your Honor. Yes. And it was sent to, the recipient of that was Mr. King. No, Your Honor. The recipient was the Quality Review Committee. So it went directly from Ms. Barker to the peer review? It was prepared for the purpose of being reviewed by Mr. King. I want to know where it went. It didn't go to Mr. King? It did not, Your Honor. And I think what Your Honor is referencing is our original privilege log that was submitted in response to plaintiffs' written discovery. And that was subsequently clarified through Mr. King's affidavit. And Mr. King oversees the entire quality assurance process. I understand that, but I just want to make sure the two from. And then on the Investigation Summary, that was authored by Mr. King? Correct, Your Honor. And that then was sent to, from what I got, an internal document for file initially. And that was something that was listed on our privilege log. And again, Mr. King then clarified, indicating that it went to the Quality Review Committee in his affidavit. Is that the same committee that the Sentinel Event Report went to? No, Your Honor. Actually, there are two different committees, all within the performance improvement and quality assurance structure of the hospital. So was anyone called the Peer Review Committee? Not involved in this particular case. No, there was not. Thank you. The, Mr. Ritter's death on July 21st, 2016, constituted a Sentinel event that triggered the quality review process. A Sentinel event is defined in the hospital's policy as an unexpected event resulting in death or serious psychological or physical impairment. And once the quality review process was triggered, an investigation per the hospital's policy must be conducted. And that's what occurred here. The, according to Mr. King's affidavit, Ms. Parker, as the Senior Vice President of Clinical, is in charge of investigating Sentinel events. And that's what she did. And then prepared the report, which she also did and is one of the documents that we are claiming privilege over, and provided that document to the Quality Review Committee for purposes of increasing knowledge about the circumstances around Mr. Ritter's death, developing strategies, and as well as You're not taking the position that anything that the committee happens to look at is privileged. Absolutely not. That's true, Your Honor. So doesn't the committee have to be the moving force behind the creation of these documents for the privilege to apply? In a sense, yes, Your Honor. The committee must convene in order for the investigation and review and the privilege to attach. And here, once the Sentinel event happens, the committee automatically convenes. It automatically convenes. Okay. And that is actually consistent with Northwest Community Hospital's procedure that was discussed in this court's decision in Artesana and its progeny. Northwest Community Hospital had a similar situation where the Departments of Surgery and Anesthesia would set defined criteria. And if a particular event meets the defined criteria, it automatically triggers a review process. And that's what happened in that case. The Quality Review began shortly after plaintiff's discharge because the criteria was hit. And that's okay, but these are all hospital-driven programs or committees or whatever. They're not set up in compliance with or looking at the peer review process, the Medical Studies Act. Are you referring to the committees at the hospital, the Chicago Behavioral Hospital? Yes. There are peer review and there's also quality assurance. And both fall within the purview of the Medical Studies Act by the very plain language of the Act. It's the committees of licensed or accredited hospitals used in the course of internal quality control for the purposes of reducing morbidity and mortality. And oftentimes in the decisions, the courts are looking at a peer review process. But that can also be synonymous with quality review. Peer review tends to look directly at an individual's role in the care issue. Whereas quality assurance or what is referred to as a root cause analysis in the hospital, Chicago Behavioral Hospital's policy, looks at the processes, looks at the system and how the hospital and the departments are all interacting and whether there was an issue there. And I understand that. But looking to the case law that's construed in the Medical Studies Act, for example, Gross-Heutsch, excuse my German, versus Edward Hospital and the EIDD case, EIDD versus Loyola, isn't it suggested very strongly in those cases that the peer review committee has to be the one that requests these things before it can be covered by the Act? I disagree. I think in, for example, the EIDD case, that was a situation where the chief medical officer called the risk manager and instructed for an investigation to begin. However, the chief medical officer received that authority from the bylaws. And in EIDD, he didn't request, excuse me, the chief medical officer didn't request any particular documentation. Rather, it was investigate and get us the information that we need as a committee in order to assess the event that happened and improve patient care. Okay, so remind me where the request came from in the EIDD case. The request came from, or the risk manager was the one who learned of the event. The opinion does not state how. But do they have a peer review committee set up? Yes, they do have a peer review committee set up, just as Chicago Behavioral Hospital does. It actually has several committees with different focuses. But can you have several peer review committees pursuant to what's the responsibility or the privilege relative to the Medical Studies Act? Absolutely, Your Honor. And this Court has addressed those types of situations, for example, in the Artisan case. There, there was a peer review committee in the Department of Anesthesia and one in the Department of Surgery, both investigating the event, which happens commonly in hospitals due to the many different aspects that need to be looked at, different types of care, different procedures, things like that. Are we affected by the wording in Artisan that it said the contents of the documents were privileged? It said it in the documents, did it not? I believe that it did, Your Honor, yes. Yeah. So does that change the analysis at all, that they had that in Artisan and you do not hear? No, I don't believe that it does because the Appellate Court has recognized that just simply stamping privileged or confidential on a document doesn't make it so. But the substance of the document is a substantial basis that this Court can rely upon in upholding the hospital's assertions of privilege. And that's exactly what this Court did in Artisana and in Hyde, I believe. And here we've given the Court the privileged documents and a secure record, and we've also provided, as we did in the trial court, the unrebutted affidavit of Mr. King, who attests to the process that the hospital engaged in. Okay. But in Hyde, there was, I believe, a factual finding by the trial court that the people preparing the reports were designees of the committee, of the relevant committee. And you say that in your brief, but I don't see that in the affidavit. So you tell me where in the affidavit anyone says that these people were designated by the committee to do this investigation. The word designate is not in our affidavit, Your Honor, and I have to admit it was somewhat inartfully drafted. However, form over substance, and I can tell Your Honor that in the policy that is attached to Mr. King's affidavit, it indicates that the director of performance improvement will conduct all RCA, referring to root cause analysis, events. And it discusses how these events will be investigated and reported. And further, Mr. King, as the director of performance improvement and risk management, attests in his affidavit that he then asks for the assistance from the senior vice president of clinical, who at the time was Ms. Barker. And it should not be discounted that Mr. King is himself a member of the performance improvement oversight committee. So he is a member, which is similar to the Eyde case where we have the chief medical officer, also chairman of the committee in that, that was at issue in that case, instructing the risk manager to start the investigation. And, I mean, I have to say, and you can, you may feel the same way, but maybe you can elucidate why it happened. The absence of any factual finding by the trial court to support the decision is a concern to me. Or, I mean, you don't have any factual finding. It's a factual question. Are you a designee of this committee or not? That's correct. The trial court did not make findings either way. Although there was a written order, it simply stated that we had not met our burden. Exactly. So it's unclear for why we did not meet our burden. One of the reasons why we are here testing the correctness of the trial court's ruling. And that's also why we have provided this court with the documents. Because, again, the documents themselves can be a reason for sustaining our assertions of privilege. And in this case, the documents taken together with the unrebutted affidavit of Mr. King establishes that they are protected under the Medical Studies Act. And further, there is the third document, which is the narrative also prepared by Ms. Barker, that is subject to the insured insurer privilege. This, again, the trial court did not make any sort of factual findings. But I think it's clear from Mr. King's affidavit that Ms. Barker drafted the narrative and sent it to Arch Insurance and drafted it for the purpose of informing Arch of a potential lawsuit arising out of the death of Mr. Ritter. So the purpose of obtaining counsel, we're supposed to assume? And on what basis are we supposed to assume that? Well, in Mr. Ritter's affidavit, he indicates that the purpose of drafting. You don't know Mr. Ritter. No. Excuse me. Thank you, Your Honor. Mr. King indicates that it was drafted for purposes of notifying and ensuring that there would be liability insurance coverage should a potential malpractice case result. So that was the focus of it? Exactly, Your Honor. And it was transmitted to Arch. It's really the attorney-client privilege. So where is the attorney in this? The insurer-insured privilege is an extension of the attorney-client privilege. However, an attorney does not need to be present. And the cases that we have cited in our brief, RAPS and lower, I believe, hold that there does not also need to be an attorney present or on the communication. But shouldn't it be for the purpose of seeking some kind of legal advice? That is not a necessary element. However, the court in RAPS noted that it is an extension of the attorney-client privilege. The insurer-insured privilege can apply when the insurer may properly assume the communication is made to the insurer for the dominant purpose of transmitting it to an attorney. And why do we know that's true here? That's my question. Well, we know that's true because in the affidavit, Mr. King indicates that one of the reasons that Ms. Barker prepared the narrative was to make sure that there would be liability coverage should a potential malpractice suit result. And that's exactly what's happened. But you're not asking for any advice, but just to say we want an insurer covered by insurance. Yes. Yes, Your Honor. And that's exactly what was at issue in RAPS, which is that there was an investigation by the insurance company, and there was no attorney involved at that point. And so there doesn't need to be an attorney involved. And I will reserve my remaining time for rebuttal if there's no more questions. Thank you. Good afternoon. Again, Stephanie Rubin on behalf of the Ritter Estate. I don't want to rehash everything that I put in the brief and that counsel has put in their brief. But the question of whether specific materials are part of the peer review process under the Act is a factual question within that legal determination. It will not be reversed on review unless it's against the manifest weight of the evidence. I think that is the important thing to note here today. I agree. I may be the only person in this courtroom that hasn't seen these documents in question, so I can only provide or shed some light on why I think they should be produced. I go back to the initial privilege log, case summary, detailed case summary, investigative report. I don't know what that is. To me, there's nothing about that that triggers in my mind that that should be protected under the Medical Studies Act. We followed proper procedure. Judge O'Hara reviewed it in camera and wrote an order to turn it over. The affidavit was supplied for Mr. King. Again, we did not feel that that, again, gave us enough information that it should be. Judge O'Hara agreed and reaffirmed his ruling. Was there no affidavit provided the first time, and that was only provided on the motion to reconsider? Correct, Your Honor. There was no new law provided. Just the defense counsel at that time added an affidavit in response, but with a fuller brief after Judge O'Hara ruled that it should be provided to us. Do you have one explanation from the court, a little bit more explanation as to the basis? Unfortunately, no. We were handed a written ruling that's attached numerous times to the record here with the Petro case. That was the only guidance that I had, absent whatever arguments I wanted to raise before this Court for your consideration. So you don't ask a lot of questions, right? Right. And we have not even conducted oral discovery in this case. We are literally in interrogatories and requests to produce. So I haven't gotten the chance to depose many people and even see what else could potentially be at issue here. So I am very blind coming into this. But Judge O'Hara had two bites of the apple and both times felt that these documents should be produced. And we have to presume, I assume at this point, that he did make a factual finding that supported his ruling. I mean, I don't know what else we can do at this point. Well, right. That's kind of where I stood in terms of filing some type of response. I guess I want to note that, you know, I tried to raise some other potential issues that I could see or have seen the documents myself for this Court to consider. And I do think in a lot of ways it is very factual. You have to look at the documents. You have to see who they were used for, who they were prepared for. The original privilege law says they were prepared for individuals, that they were prepared for a committee. They weren't called a sentinel of that report or anything of greater significance until they were denied by or until they were ordered to be produced by the trial court. All of a sudden then they came up with these magical names that would arguably put them under the protection of the Medical Studies Act. Frankly, you know, almost everything now in these cases is being argued as under the Medical Studies Act. And as plaintiff's attorney, you are looking at it to see if that's true or not without being able to see the documents. So without an in-camera inspection, we have no other remedy to see whether or not those documents should be produced. I do want to just add on the insurer, insurer privilege document. There's a couple things I just wanted to raise. I believe in the LAR and RAPS case, both of those, it was initiated by the insurer requesting these documents. It wasn't by the insured specifically. The insurer was doing an investigation and asked for statements or documents to be produced. Why does that matter? Well, here on their offer, there's no question about whether there is litigation or an attorney-client privilege being established yet. They're basically saying we did an investigation, potentially an incident report, where we gathered information and we're giving it to you in anticipation of litigation, they're saying. But at that point in time, it was within a few days after the death, and it wasn't requested by the insured as part of their investigation. It was done by Chicago Behavioral Health Sciences as part of their old review. Okay, so in RAPS, it was from the insurance company to the hospital. Yes, and in LAR, it was by the insurance company for the automobile insurance to their insurance requesting information and statements from them. It didn't involve hires at all in any way or any legal issue? Not that I'm aware of, no. It was the insurance company doing their own internal investigation, requesting their request documents for them to review. Here, this was done during this time period after the death and provided to them. Whether that falls under the privilege, I think, is something that makes it distinguishable from those two cases. And, again, I think it's a factual question whether the two other documents, the Sentinel Gantt report and the investigative summary or whatever, I apologize it's called now. Staying on the insured insurance for just a minute. Yes. On what basis are we supposed to presume or not presume? Because the elements, let's assume for a moment the elements are met. We know the identity of the insured, we know the identity of the insurance carrier, we know that there is a duty to defend, and the communication was made between the insured and the agent of the insured. Let's assume those elements are met. But then there's this fifth element that's not listed as an element about presuming that the insured may properly assume that this is made for the purpose of transmitting it to an attorney. How are, what is that inquiry supposed to be based on? I think that's a tough question. And, again, in the affidavit that was provided to us, it states that Ms. Barker prepared this report with the primary purpose of submitting its findings to the insurance carrier. Were there other purposes? Was it provided to other people? I think that's left ambiguous for this Court. If it is provided to other people, then arguably that would break the attorney-client privilege. If it's provided to outside people, as if there was multiple people in the room, that attorney-client privilege would be broken arguably as well. Anything else? No. Thank you. Thank you. This case isn't an almost any case. There are two documents. Out of all the documents that the hospital maintains that Chicago Behavioral Hospital is claiming privilege over pursuant to the Medical Studies Act. And the trial court, in overruling that privilege, cited no factual findings, but instead did cite paratrial, which is distinguishable for many reasons. One, it was an assisted living facility involved in that case, did not fall under the Medical Studies Act. The documents were not maintained by any sort of committee. The documents were also authored by nurses who were involved in the patient's care. So for that reason, and the reasons that Mr. King has in the affidavit, as well as the documents themselves, the privilege should be sustained. And I understand that that plaintiff's counsel argument is that she cannot respond appropriately because she has not seen the documents. But this Court has rejected that argument several times, one time being in the Daily vs. Torero case, a case we cite in our brief. But I don't care that she hasn't seen the documents. I mean, you're right. That's always going to be true. But it is a little – I mean, we have to make a finding that the trial court's factual findings are against the manifest weight of the evidence. And I don't know what – you know, where – on what basis we would make that. This is not a legal analysis. I think everybody pretty much agrees on what the law is. It has to be a report of the committee or its delegate, somebody that the committee delegates to do this report. And just the finding, the implicit finding that these people were not delegated to do these reports, I don't see how that's against the manifest weight of the evidence. I guess to just put it in a nutshell, where is the manifest weight that says that's wrong? Well, we don't know if that's right or wrong. Perhaps the trial court did hear the accountants. No, no. I apologize. I don't mean we. I don't – I mean whether that's what the trial court concluded. We don't – because we don't have an order from the trial court indicating whether the trial court found that Mr. King and Ms. Barker were designees. The trial court could have decided the issue on another basis. But what the court has is the court has the evidence. The court has the privileged documents and the affidavit, everything that was available to the trial court, in order to make a decision. And I would like to, in just a brief minute, address Justice McPherson's comments about the fifth element of the insurer privilege, that the assumption that it will be transmitted. And I think People v. Ryan, that's the Supreme Court case that addressed the insurer-insured privilege. And I think in that case the Supreme Court said not that it's a fifth element, but that's the reason why the attorney-client privilege can be extended over into the insurer-insured relationship. And then there's only the four elements that need to be upheld, which is what Mr. King did and explained in his affidavit. And as I read, Brian, it's because usually, except in some unusual circumstances, and we've seen some of those cases, that's why an insured talks to their insurance company. We're giving you this information because you're going to get us a lawyer. Here you go. Get us a good lawyer. Right? Absolutely. And I'm here. Thank you both. Very good job. And we'll take this matter under advisory. And we are now in recess.